Please the court. I represent Mr. Ortiz Alvarez. Seems to me that there are two questions on appeal. The first is the propriety of the hazardous waste enhancement and then if you believe that the it was improper whether the government has met its very heavy burden of showing that it was harmless error the application of the hazardous waste enhancement. I think the propriety of enhancement is a very easy question. We have a methamphetamine lab here and the question is whether the offense involved the violation of the Resource Conservation and Recovery Act. And we know a couple of things. We know from the agent's testimony at the sentencing hearing, the case agent who obviously has the most familiarity about the case, that no testing was done to see if any of the materials qualified as hazardous waste under the Resource and Recovery Act. So that's one thing we know. The other thing we know is there was no identification of any material seized other than methamphetamine or any acetone was in the cans that were seized. And those are the only two materials that were identified as having been seized other than generic stuff like strainers and thermoses and things like that. In response to the objections that were sent in the court prior to sentencing, the government's response was very straightforward. It said the enhancement was proper because it goes without saying lab would produce something hazardous and or toxic. No further, again, identification of any materials that they're claiming were violating the Resource and Recovery Act. And so we have two Fifth Circuit cases and luckily Judge King was on the panel in both the Fifth Circuit cases. We have Sauceda and we have Pergine. Should I start again? No, no, you don't need to start again. We can hear you. It was breaking up just a bit, so you can just pick up where you left off. Sorry about that. Oh, no, believe me, I completely understand. In any event, we were talking about the two Fifth Circuit cases where the enhancement was held improper under similar circumstances. And one of the things I will note is the government in its brief, in this case on appeal, points to the acetone cans. It was actual acetone found in the Sauceda case. And this court still held that the enhancement was improper. And then we have the job case out of the Ninth Circuit, the most recent case, where the district court basically made the same argument the government makes here, that it had no problem with the fact that hazardous waste goes hand in hand with a methamphetamine lab, and therefore the enhancement was proper. The exact same argument the government makes here. Yet the government argues that job was inapposite to this case, but I would submit to the court that job is exactly on point. In fact, in job, acetone and other substances were found, and the government argued that that was a per se violation of the Resource Recovery Act, which is exactly what the government argues on appeal. And the Ninth Circuit noted that there was no evidence to sentencing regarding the, quote, form, quantity, or storage of these substances, and reversed the hazardous waste enhancement. So you see this court's precedent in Sauceda and Pergine had job on top of it, and I think this is a really easy question, the first question of whether the enhancement was improper, and whether the two-point hand for the hazardous waste was improper. Counsel, assume with me for a second that it was undisputed that your client used the acetone to salt out the methamphetamine. If that were true, would there be any dispute on appeal that there was a RCRA violation? Well, with the hypothetical, we're assuming it's true. I don't think there's evidence of that, other than the acetone cans that were found. But no, that's exactly the argument that the Ninth Circuit rejected in job, where acetone was found, and in Sauceda where acetone was found. No, no, no. So it's definitely different than Sauceda, and we can get to Sauceda in a second. But before we do, because obviously there was no argument about the acetone can in Sauceda, it was just about vapor and smell. But I just want to, before we get to Sauceda, just help me understand. Suppose it's undisputed suppose when the agents walked in that your client was pouring the acetone into the meth mixture, sufficient that it could not be denied that the acetone had been used to salt out the meth. Would there be any dispute about whether there was a RCRA violation? Well, I guess we go back to job, and we have to know the quantity. But I mean, if they walked in, and there was, you know, he's at the table where they make this up, and there's some no, there would not be. So really what it boils down to is, was it within Judge McBride's discretion to find by a preponderance of the evidence that an empty acetone can in a meth lab had been used to make meth? Well, and of a sufficient quantity. So what would be the sufficient quantity that would be necessary to trigger the RCRA violation? I don't know, honestly, is my candid answer. And I rely on job when it talks about a sufficient quantity. Because I'm sitting here and I'm looking at the RCRA, the implementing regulation, the part that lists acetone when used to create this substance. And it doesn't say anything about this, about the quantity of it. No, I understand. It had been used to make methamphetamine. And therefore, really, the only question is, can you fairly infer that an empty acetone can in a meth lab was used to make meth? Well, except we do go back to Seceda, where actual acetone was found in the lab. Yeah, but see, the government's argument in Seceda is totally different. So let's talk about that. Maybe you can help me understand. The government's argument in Seceda is, well, it smelled really bad. And so that's a toxic admission. I don't see anything in the briefing. I don't see anything in the government's argument, and certainly nothing in the Fifth Circuit's opinion, that talks about this stored or treated and the fact that the acetone had been used to make the methamphetamine. There's a description in the factual discussion about the acetone, but nothing in the discussion of the holding of the case. It just says you have to be able to show by a preponderance of evidence a RCRA violation. Full stop. Well, I admit that I did not go and look at the briefing in Seceda and see what the presence of the acetone was not dispositive of the court's opinion in its discussion of the propriety of the enhancement. But it seems to me it would follow that if the presence of acetone, and again, there was actual acetone in that case, not empty cans, but the presence of actual acetone was a per se violation of the Resource and Recovery Act that the court would have affirmed in that case. I mean, I used to say there's no other discussion of the acetone in the opinion other than just in the factual background. Right, so unless you're saying that the government and the court totally missed that, I think you can rely upon Seceda. No, no, no. So, I mean, our court routinely, we decide the questions that are presented by the parties. It's an adversarial system. We don't decide cases based on what we think the best arguments are that a party might raise. And if the government's not going to argue about the acetone and the storage or treatment as the PSR did here, as Judge McBride did here, and as the government does on appeal here, then I don't see what Seceda really gets you. Well, the PSR and Judge McBride didn't really do that. It was mentioned in the factual recitation of the PSR that acetone cans were found. It didn't use the presence of the acetone cans to justify the hazardous waste. Well, let me ask you, while we're talking about factual inferences and things that can be taken from the PSR, I have a beautiful six-year-old daughter. And suppose I come home from work and I see her standing next to an empty cookie jar with her face covered in chocolate chips. Can I fairly infer that she ate the cookies? Or do I need some like testing of her blood sugar to figure out where all the cookies went? Well, I have a seven-year-old girl, so I appreciate the analogy. I guess it depends in some degree. I mean, the acetone cans, we don't know how old they were. We don't know whether they were used at that location. The burden of proof here is on the government. And it's not the same thing when dealing with a child who doesn't have constitutional rights. Or at least in my house, she doesn't have constitutional rights. If the court has no other questions on that issue, I'm going to move to the harmless error issue. On initial look, that is to me a closer question. But then you dig down, and the government bases its argument on Judge McBride's one sentence at the sentencing hearing. And Judge McBride said, this is the case where the government had charged the defendant with the true offense conduct. He would have had a life sentence guideline range, and I would have imposed a life sentence. And then he goes on to deny a 5K1 despite the very substantial assistance because he was imposing the 480-month sentence rather than the life sentence. And if you look at this court's jurisprudence on harmless error in connection with guideline application, one of the cases I looked at was United States v. Judge Juarez. Judge King was on that panel also. And it says the government has to prove two things. First, it has a heavy burden to prove harmless error. But more important for our case, it has to show that the sentence guideline calculation. And in here, it's impossible for the government to meet that heavy burden. Because the guideline calculation with the enhancement, Judge McBride was right, it was a level 43 and it equals a life sentence. And he said he would have given a life sentence because the guideline range was life, but he couldn't because of the 480-month cap. But the proper guideline sentence without the enhancement was an offense level of 41 and a guideline range of 324 to 405 months. In other words, district court's statement at the sentencing the government relies upon to argue harmless error was premised on the very faulty application of the guidelines we're talking about. And then you also have to remember that Judge McBride denied a 5K1 on top of that despite the fact that Mr. Ortiz-Alvarez provided information leading to three other arrests and the seizure of 127 kilograms of methamphetamine. And he denied it because he thought Ortiz-Alvarez was getting a deal because the guideline range was life, but the statutory cap was 480 months. Whereas if the guideline, if we start from the guidelines were actually significantly lower, they were not life-term guidelines and it wouldn't be a justification to deny him a 5K1. So when you go back to the harmless error analysis by the court and improper guideline calculations and ask whether the sentence was in any way influenced by the erroneous guideline calculation, Judge McBride's statement actually supports a finding against harmless error rather than because he assumed that the guidelines were life. But he assumed that based on the faulty application of the harmless error guideline. The court has no other questions for me. I'll yield the rest of my time. Can I just ask you about one sentence in this paragraph of the sentencing transcript that you're talking about? Yes, absolutely. What I see is Judge McBride says this is a case that the government, this is what you just read. If they had charged a true offense he would have had a life sentence range. But this is the part that I'm hung up on. He says, and I would have imposed a life sentence. That is, I'm going to do what I can do at the top end of the range full stop. So it's not clear to me how that supports your position because it seems like he's saying I'm really concerned about the damage done by this methamphetamine lab. And so I'm going to sentence at the top of whatever I'm allowed to do regardless of the range. I can only do 480, so I'm going to do 480. Judge, I respectfully disagree. What he is saying is the guideline range is life. And based on that guideline range and the damage caused, I agree he's concerned about the damage. But based on the guideline range which he specifically mentioned and the damage, had his guideline range been life, I would have sentenced him to life if I could. But he's starting from the premise that the guideline range is life and he uses that to impose a life sentence and why he denied a 5K1. He doesn't say, had I not implied the enhancement, I still would have imposed the same sentence. And therefore, the burden, and the court describes it as a heavy burden on the government to show harmless error. I think in light of that, it's absolutely impossible. If you compare that to the co-defendant, in the co-defendant's case, he said, no matter how I resolve these guideline issues, I would have implied the same sentence. And he does not say that here. All right. The judge probably made a conscious choice in both cases to express his opinion. His opinion in this case was his comments were based on determining that it was a lifetime guideline. And I'll yield the rest of my time. Thank you, counsel. Mr. Stoltz. Thank you, your honor. May it please the court. The court should affirm for either of two independent reasons. The first is that the record supports the finding that the hazardous waste enhancement applied here. And that's particularly true under the deferential clear error standard that applies. The second reason is that any alleged error was harmless, given Judge McBride's clear statements that he would have imposed the same sentence, or frankly, would have imposed a higher sentence if he could have, for the same reasons and based on factors that are not connected to the hazardous waste issue at all. So I'll start with the first issue. The record is clear. Page 71 of the record describes what was discovered at the scene of this methamphetamine laboratory. And just to back up for a second, this is a large scale methamphetamine operation. It involves gas tanks that have been fabricated and partitioned in order to smuggle methamphetamine in liquid form into the United States. Then the methamphetamine is recrystallized at this lab in Fort Worth. So this is not a case involving a user who buys some Sudafed tablets and tries to make his own meth. This is a large scale operation. Page 71 of the record describes what was found at the scene. That includes hot plates, acetone cans, a number of thermoses, strainers, a scale, the gas tanks, and several coolers that were being used in the process of reconverting this methamphetamine. Page 71 of the record also describes the phone calls on which the defendant was captured, explaining that he had stayed up all night the very night before his arrest, working in this lab to recrystallize the methamphetamine. Again, on page 71 and then 73 and 74 of the record, the PSR explains that a DEA lab team was called out to the scene. There was a determination made that it was necessary to engage a separate environmental firm to aid in the safe destruction of these materials. So that separate environmental firm, AET Environmental Services, was then engaged. And the PSR makes it clear that there was no permit under the applicable statute for these activities. So based on this record, I think the district court was on very solid ground in reaching the conclusion that the hazardous waste enhancement applied. And at the very least... Mr. Stokes, wasn't it common for an outside firm to be hired to clean up where they found the meth lab? Wasn't that pretty common? Your Honor, page 189 of the record is testimony from the case agent that is on this point, and it's testimony that's cited in the brief. And the case agent was asked if it was common to do this. But if you look at page 189, the case agent was asked, is it common to have somebody come in and haul away when there's toxic materials? And the case agent said, yes, it is common. In other words, yes, it's common when there are toxic materials. So I think the defense... Hold on a second. So you're telling me they made a determination that there were toxic materials, and then they decide whether or not to call in an outside firm to clean up. Is that what you're telling me? Not precisely, Your Honor. I think what I'm saying is that the question and answer on page 189 of the record that defense counsel has relied on from the case agent was a question about whether it's common to call in an outside agency when there are toxic materials. And the agent said, yes. My point is simply that that answer that it's common to call in somebody for toxic materials, that doesn't imply that, which I think counsel is trying to imply, that they're called in for any time that methamphetamine is discovered. That's not the case. Here, the record shows that a DEA lab team was called into the scene, and then the DEA lab team then made the decision to call in the outside environmental firm. Now, is it plausible... Do you know the basis for that lab team's decision? No, Your Honor. I don't think the record details the basis for the decision. I think, you know, the question is, was it plausible for Judge McBride to conclude that the lab team having evaluated it and then calling in the environmental services team, does that make it plausible to suggest that there was hazardous waste? I think it does. It's at the very least, it's plausible. That's not to say that every time, you know, that there's methamphetamine, there's hazardous waste. That's not the government's argument here. But the argument is simply that on this record, where the record is undisputed, that there's acetone cans found at the scene in conjunction with hot plates and other cooking instruments, it was plausible here for the district court to make the finding that it did. Um, let me also just... There was some issue about quantity. Council suggested that there might be some requirement that there be specific findings for, you know, what quantity of a particular chemical was present. I don't think there's any... There's certainly nothing in the text of the enhancement to require the district court to make findings about specific quantities. And there's nothing requiring the agent or the lab to make findings either. I think the application note to this guideline is telling, because if you look at this particular enhancement, it's actually a multi-leveled enhancement. The defendant here received the lowest enhancement, which is a two-level enhancement, just for the presence of hazardous hazardous waste. Within the same enhancement, there are higher level enhancements up to up to a six-level enhancement if there's a finding that there was a substantial risk of In the application note, it talks about if the district court is going to apply one of these higher level enhancements, then the court should make findings about the quantity and the types of waste that are found. But there's no similar requirement that just to apply the two-level enhancement that there's a necessity to make any sort of findings about quantity. As far as the acetone, I think that the Jobs case that was cited from the Ninth Circuit is distinguishable. The acetone in that case was found in a garage. The opinion makes clear on page, I believe, 858 of that opinion, that it was unknown if manufacturing was even taking place at that premises. So that's clearly a case where there's a chemical that's found on the property, but there's no connection necessarily to the actual offense. Likewise, in the Sauceda case, the court did not make any decision based on acetone. The PSR apparently relied solely on the fact that there was fumes. That's not the case here. Here we have a PSR that specifically noted the acetone, specifically cited the Resource Conservation and Recovery Act, and that there was a violation of that act. But here they didn't find any acetone, did they? Your Honor, the record reflects that there were acetone cans. The record does not specify how much, if any, quantity was in the acetone cans. I think it's certainly fair, and it was plausible for the district court to think that there was at least some acetone still present at the time it was found, and I think it's beyond... Is there some requirement that there be enough acetone that it's ignitable? Your Honor, no, I don't think there is a requirement of that. And I will say, in the regulations, and we discussed this in our brief... Was any testing done to determine whether or not acetone was in the can, or how much residue, or any of that? Your Honor, there was no testing done of... The record does not reflect any testing done of any of the hazardous materials. The only testing that was done was of the purity of a portion of the methamphetamine. But, as we discussed in the brief, acetone is actually listed two separate times in the EPA regulations as a hazardous waste. One for acetone in and of itself, and then a second time for acetone that's part of a residue or an inner lining, an inner lining from any sort of container that it's been in. So I think what those regulations make clear is that chemicals like acetone that are ignitable are dangerous, not only in and of themselves, but also to the extent they've been in a can, or they've been in contact with some other surface. Because realistically, there's always going to be some sort of residue, particularly if it's the morning after the chemical has been used. So it's still a dangerous substance even after it's been used. And again, it's plausible, it's more than plausible for the district court to conclude that there were substantial quantities as part of this conversion process. There was 49 kilograms of methamphetamine discovered in this laboratory. That's a very large amount of methamphetamine. And so I think, again, the record supports the notion that there was acetone and sufficient acetone there to apply this enhancement. Let me turn to the harmlessness issue. A couple things I'd like to respond to there. One is counsel mentioned the 5k1. I don't know if it's the 5k1 was denied in the sense that the district court did not actually grant a below guideline sentence. But if you look at page 199 of the record, the district court in a sense actually granted the 5k1 because the district court said that he found that the defendant did provide substantial assistance to the government and that the defendant would qualify for a sentence below the bottom of the guideline range. So the district court actually found that there was substantial assistance and that the district court therefore did have the freedom to impose a sentence of, you know, essentially whatever sentence it wanted. I think that's further evidence that the district court was in no way viewed itself as anchored to or connected to whatever the guideline range was. So the notion that, you know, the district court only opposed the 40-year sentence here because it thought that was the guideline range, I don't think the record supports that. To the contrary, the district court on several cases referred to the guideline range. Yes, your honor, there were references to the guideline range. And he said if I could do life, I'd give life. But then he looked at the guideline range and then he did the top of the guideline range. I don't know that I don't know that that's how I would characterize what happened. I think what happened is that the district court wanted to give a life sentence but was constrained by the statutory maximum. And so he said, I want to give a life sentence. And again, that was based on the evidence of the very substantial nature of this methamphetamine smuggling and distribution, substantial quantities of methamphetamine. Let's go with your premise. Let's say he wanted to give a life sentence, but that's not what the guidelines provided, didn't provide for a life sentence. So he couldn't do it, right? Well, that's what he said he wanted to do, right? That's correct, your honor. The reason that he... So then he goes to what he has determined is the correct guidelines range and he gives the the guideline range would have been a life sentence, but for the statutory maximum. Yeah, I see on page 79, it looks to me like the guidelines range was life, not 480. And the only reason he chose 480 was because that was the statutory cap. Am I misunderstanding? No, that is correct, your honor. Under the level 43 category one, the guideline range would have been life, but for the statutory maximum. So in a sense, and your honor, Judge Graves, that's why I'm a little hesitant here because there's two issues. One is what the guideline range would have been, and then what became the de facto guideline sentence based on the statutory maximum. So the guideline range would have been life, but it defaulted to the statutory maximum. Now, Judge McBride, though, made very clear that, especially in light of the way the government had charged the case and had essentially not charged it as it could have to bring that life exposure into play, he wanted to give the life sentence, but he was constrained by the statutory maximum. There's no indication that the guideline, this issue of the environmental hazard played any role in that. So we think that he made himself very clear. He discussed how this is a case involving a Mexican cartel importing huge quantities of meth. He would have imposed a sentence. He also said on multiple occasions, including in connection with the 5K1 issue, that he felt that the government had already sufficiently rewarded the defendant simply by charging the case in a manner that capped the sentence at 40 years. And so that's why, even though the district court found that there was substantial assistance and that the defendant would qualify for a sentence below the bottom of the guideline range, for other reasons, he decided not to impose that sentence. So I think that the 5K1 issue, by finding on page 199 of the record that 5K1 was satisfied, that takes the case out of the guideline range completely. The judge at that point has said, this case is no longer subject to any guidelines because I've found substantial assistance. I can impose a sentence below, essentially whatever I want. And nonetheless, I still think a life sentence is appropriate, but I'll do the 40 years. So on this record, again, it's a, it is a, you know, this is obviously every case stands on its own record. Our position is that this record here shows that for all the reasons that the district court discussed, the life sentence was the sentence, or the 40 year sentence is the sentence that would have been imposed. I'm happy to answer any questions. Other than that, we would ask that the judgment be approved. Can you all hear me now? We can. All right. So I wanted to go back and talk about my exchange with Judge Oldham, because during the break, I did pull up the briefing in Sauceda. And in the government's brief, it says the record reflects the defendant's offense involved hydrogen chloride, hydrochloric acid, and acetone. All three substances are designated as hazardous substances under the Resource and Recovery Act. And then it goes on to talk about the fact that they had to call out a team, they had to evacuate a street, and yet Judge King and Judge Elrod and Judge Barksdale, in a published opinion, said the judge abuses discretion in that case. So I really don't know how you get... But the government's theory in Sauceda literally says there is a separate RCRA violation for emission, right? Emission of the toxic materials. And so they thought they could infer reasonably an emission from the smell. Maybe that's right. Sauceda said it was wrong. I'm not sure what that has to do with the acetone can. Well, because the way I'm reading the briefing, and granted I only had a little time to do it, but it's talking about the exact same argument the government makes here. Hey, look, they found chloride, acid, and acetone. Those are hazardous substances per se. Can I ask you, what if instead of finding acetone cans along with 49 milligrams, I'm sorry, kilograms of methamphetamine, what if the cans said on the outside, like on the label, it said acetone for making 49 kilograms of methamphetamine? Would they still need to do other testing? So the empty can, say, whatever it's used to make a lot of methamphetamine. Exactly. Acetone for meth making. Is that sufficient? Well, candidly, I'm not familiar with the, thank goodness, the concept of meth making, but I think you're almost getting to the point where then any meth lab, you apply the enhancement. I'm not sure. I don't know if it's true or if it's right or wrong about any meth lab. I don't understand it either, but I think the legal question we have to decide is could the judge fairly infer from empty meth cans in a meth lab that those, I'm sorry, empty acetone cans in a meth lab that they were used to make the meth. And so I'm just asking what additional facts your make the meth? Well, I think you would have to know the quantity according to job. The presence of acetone isn't enough unless you think Judge King, Elrod, and Barksdale just missed the government's argument and so faded because I'm reading it and that's the argument the government made that the presence of those three chemicals alone was hazardous waste per se under the Resource and Recovery Act. Just briefly on the harmless error, I think Mr. Stoltz almost makes the defendant's argument. He's saying that Judge McBride said he would have qualified for a below guideline sentence, but since the guidelines are light and I'm giving him 480 months, I'm effectively giving him a 5K1. So Judge McBride in his mind thinks he's giving Ortiz-Alvarez a 5K1, whereas if the guideline range was the proper guideline range, 324 to 405, obviously he's not giving Ortiz-Alvarez a 5K1. So I think Judge McBride's argument, Mr. Stoltz's argument actually supports the defense and doesn't meet the government's heavy burden. And I come back to the fact that Judge McBride knows how to make his sentences appeal proof. We know that from the co-defendant's sentence. Judge McBride could have easily said, I don't care how I resolve these objections, I would have given a light sentence anyway. We know Judge McBride knows how to say that, and that's not what he said. He said this was based on the guideline range being light, and my inability to, or my, I can only give a 480-month sentence, so I'm not giving a downward departure. I'm giving him the high end of the guidelines, which is effectively 480 months. And if the court had no further questions for me, this was a unique experience. All right. Thank you both, counsel. We're going to take this matter under advisement, and we are adjourned. Thank you.